UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CINCINNATUS PARTNERS I, LP, *et al.*, | : | Case No. 1:11-cv-427 |
| | : | |
| Plaintiffs, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| FARM BUREAU PROPERTY & | : | |
| CASUALTY INSURANCE | : | |
| COMPANY, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER DENYING THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT
### (Docs. 77, 81)

This civil action is before the Court on the parties' cross motions for summary

judgment (Docs. 77, 81) and responsive memoranda (Docs. 112, 127, 130, 133).[1]

## I.  BACKGROUND FACTS AND PROCEDURAL POSTURE[2]

This is a contract dispute between parties to a limited partnership agreement.

Cincinnatus Partners I, L.P. ("Cincinnatus") is an Ohio limited partnership between

Cincinnatus Capital Partners I, LLC (the "General Partner"), as a 1% general partner, and

Farm Bureau Property & Casualty Insurance Company ("Farm Bureau") as a 99% limited

partner.  The purpose of the limited partnership was to profitably grow Farm Bureau's

---

[1]  Both parties requested oral argument on these motions.  However, counsel were unable to find
a mutually agreeable date for oral argument.  Moreover, the Court finds that the pleadings are
clear on their face, and that oral argument is not necessary.  *See Whitescarver v. Sabin Robbins
Paper Co*., Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, at *7 (S.D. Ohio July 27, 2006)
(C.J. Dlott) ("Local Rule 7.1(b)(2) leaves the Court with discretion whether to grant a request for
oral argument.").

[2]  The parties' undisputed facts are incorporated in this Order.  (*See* Doc. 81, Ex. 1; Doc. 112,
Ex. 1; Doc. 77, Ex. 1; and Doc. 127, Ex. A).

property and casualty insurance business by identifying and acquiring independent

insurance agencies, and then converting their policies to Farm Bureau policies.  Farm

Bureau was required to pay 99% of the costs and expenses of the Partnership, as well as

management fees to the General Partner, and 99% of all acquisition costs.  The General

Partner was tasked with identifying and proposing agencies for acquisition by the

Partnership.[3]  Farm Bureau, however, had an express contractual right to veto any

proposed acquisitions, so long as its decision was "reasonable."  Specifically, the

Partnership Agreement states that, within seven business days of its receipt of an

Acquisition Notice, "the Limited Partner [Farm Bureau] will provide its consent, which

consent will not be unreasonably withheld, to acquire the Target Company."  (Doc. 58,

Ex. 1 at § 3.6(b)).

      From 2008 through early 2010, the General Partner identified seven Target

Companies to be acquired and Farm Bureau acquired four of them.[4]  In mid-2010, Farm

Bureau performed a review of the Partnership and determined that it was not performing

successfully.[5]  Farm Bureau alleged that the General Partner was not adhering to the

criteria in the Partnership Agreement or the parties' original key investment assumptions

---

[3] The General Partner has "full and complete charge of all affairs of the Partnership[,] and management and control of the operations of the Partnership shall be vested exclusively in the General Partner."  (Doc. 58, Ex. 1 at ¶ 3.1).

[4] During this time period, Bruce Trost was the Executive Vice President of Farm Bureau.  He was also a chief architect of the Partnership.  Mr. Trost left Farm Bureau in the spring of 2010. (Doc. 81, Ex. 2  at ¶¶ 50, 51).

[5] Kevin Slawin took over management of Farm Bureau's interests in the Partnership when Trost left in the spring of 2010.  (Doc. 81, Ex. 2 at ¶¶ 50, 51).

when making acquisitions. Accordingly, Farm Bureau requested that the General Partner focus on larger acquisitions. The General Partner proposed additional acquisitions in 2010 and 2011, but Farm Bureau found these acquisitions were not financially prudent, and exercised its express contractual right to withhold its consent to the proposed acquisitions. Farm Bureau claims that its decisions on these proposed transactions were "reasonable." The Partnership Agreement states that, within seven business days of its receipt of an Acquisition Notice, "the Limited Partner [Farm Bureau] will provide its consent, which consent will not be unreasonably withheld, to acquire the Target Company." (Doc. 58, Ex. 1 at § 3.6(b)).

In contrast to acting "reasonably," Plaintiffs claim that Farm Bureau was simply searching for a way to exit the Partnership and escape its financial obligations. Plaintiffs argue that Farm Bureau breached contractual and other legal duties by refusing to consent to the five transactions that the General Partner proposed during 2010-2011, giving rise to claims for: (1) breach of contract; (2) indemnity; (3) breach of fiduciary duty; and (4) declaratory judgment.

Farm Bureau alleges that after investing a total of $11 million dollars, it did not realize a profit from the Partnership nor any of the four agencies that the General Partner acquired (the "Acquired Agencies"). Furthermore, the General Partner refused to permit Farm Bureau to exercise its contractual option to acquire the balance of the Acquired Agencies, so Farm Bureau has not been able to convert a single policy and has not realized any additional premium or commission income. Therefore, Farm Bureau alleges

cross claims for: (1) accounting; (2) breach of contract; and (3) breach of fiduciary duty.

The parties filed cross-motions for judgment on all claims.

## II.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## III.    ANALYSIS

### A. Plaintiffs' Claims

#### 1. Breach of Contract

Under Ohio law, a party may establish a breach of contract by demonstrating "(1) the existence of an enforceable contract, (2) the performance (or excuse from performance) of the contractual obligations by the party seeking relief; (3) breach or failure to fulfill contractual obligations by the other party; and (4) damages suffered by

4

the party seeking relief as a result of the breach." *Rumble v. Convergys*, No. 1:07cv979, 2009 U.S. Dist. LEXIS 125645, at *43 (S.D. Ohio Nov. 9, 2009).

### a. Consent to proposed acquisitions

First, Plaintiffs maintain that Farm Bureau breached the Partnership Agreement by refusing to consent to the acquisition of multiple Target Companies.

As stated, the Partnership Agreement provides that, within seven business days of its receipt of an Acquisition Notice, "the Limited Partner [Farm Bureau] will provide its consent, which consent will not be unreasonably withheld, to acquire the Target Company." (Doc. 58, Ex. 1 at § 3.6(b)). Therefore, to the extent that Farm Bureau refuses to consent to an acquisition, it must establish that its decision was "reasonable."

Under Trost's leadership, Farm Bureau never rejected an Acquisition Notice. (Doc. 81-2 at ¶ 53). In fact, Farm Bureau consented to the acquisition of seven Target Companies, four of which closed and were acquired. (*Id.* at ¶¶ 22-24). However, Farm Bureau's new management team, Mr. Slawin, *et al*., did not accept a single Target Company for acquisition and refused to fund one that it had already consented to fund (the Bowen Agency). (*Id.* at ¶ 53). Specifically, during Slawin's tenure, the General Partner submitted four Target Companies for acquisition, all of which were rejected: (i) Lacy Insurance in Nebraska; (ii) Weber's Insurance Service, Inc. in Arizona; (iii) Shifflett Insurance Agency, Inc. in Iowa; and (iv) Hegarty-Caplinger, LLC in Kansas

(collectively the "Four Rejected Agencies"). (*Id.* at ¶ 52).[6] After Slawin's tenure, the General Partner submitted the Shofner, Lynch, and Shulse Agency in New Mexico for acquisition (the "Shofner Agency"). (*Id.*) Farm Bureau declined to consent to this acquisition as well. (*Id.*)[7]

It is undisputed that Farm Bureau did not run a single IRR model for any of the Four Agencies before rejecting them.[8] Plaintiffs allege that the rejection of any Target Company absent an IRR analysis was, in and of itself, "unreasonable" in light of Slawin's testimony that he rejected the Agencies because Farm Bureau wanted "a 15 percent IRR, or else Farm Bureau won't fund the deal." (Doc. 67 at 38, 129).[9] Farm Bureau argues that nothing in the Partnership Agreement indicated that it could only veto agencies based

---

[6] In February 2011, Farm Bureau stated that it would not consider any proposed acquisition unless it met the following criteria: (1) a majority of the business must be "personal lines" business (newly defined to include only home and auto); (2) the loss ratio of the agency's business must not be greater than 65%; and (3) the agency must have annual revenues between $3 million and $5 million. (Doc. 81, Ex. 1 at ¶ 125). None of these requirements were stated in the Partnership Agreement. (*Id.* at ¶ 21).

[7] The Shofner Acquisition Notice was submitted to Farm Bureau after the deposition of Kevin Slawin concluded. Slawin testified that he would have recommended the purchase of any agency with $500,000 in commission revenue, $1 million in commission revenue, or $2 million in commission revenue, provided the IRR was acceptable (*i.e.*, it met the 10-15% IRR threshold). (Doc. 67 at 292-293). The Shofner Agency met this standard. (Doc. 81-2 at ¶ 4). However, Farm Bureau nonetheless rejected the Shofner Acquisition.

[8] The internal rate of return ("IRR") is a rate of return used in capital budgeting to measure and compare the profitability of investments.

[9] Slawin also testified that his priority in evaluating Target Agencies was discerning whether they would produce a "reasonable IRR" (Doc. 81, Ex. 1 at ¶ 110), and that he would have advocated for an acquisition provided it produced a "double digit" IRR (Doc. 66 at 166).

on specific criteria, nor was there any limitation on what "reasonable" factors Farm

Bureau could consider when exercising its right of consent.

### i.  Lacy Agency

The General Partner proposed the Lacy Agency deal on October 4, 2010.  As

Slawin recalled "…[T]he first thing in the door – first deal that came in the door was

Lacy, and after talking [with the General Partner] about what we were looking for, and

kind of the size of the deal, to have that come in … I couldn't imagine a partner of ours

would actually deliver that to our door after our conversation."  (Doc. 77, Ex. 8 at ¶ 68).

Farm Bureau exercised its contractual right to refuse to consent to the transaction, and

explained, both in discussions and in writing, why the acquisition was unacceptable.

(*Id.* at ¶ 69).

### ii.      Weber Agency

With respect to the Weber Agency deal, Farm Bureau found that the General

Partner's valuation of Weber was excessive and not market-based.  (Doc. 77, Ex. 8 at

¶ 127).  Specifically, on a revenue multiple basis, Farm Bureau maintains that the

General Partner valued Weber approximately 68-78% higher than similar sized agencies,

and approximately 16% higher than its publically traded counterparts, even though it is

only 0.05% their size.  (*Id.*)  Additionally, Farm Bureau found the terms of the Weber

deal unfavorable.  (*Id.*)  Specifically, the General Partner proposed a guaranteed purchase

price of $4 million, and added a $500,000 incentive compensation plan if the agency was

successful.  (*Id*.)  Accordingly, Farm Bureau maintains that its decision to refuse to consent to the proposed Weber transaction was reasonable.  (*Id*.)

### iii.    Shifflett Agency

Next, the General Partner submitted an Acquisition Notice for the Shifflett Agency which had $5 million of premium revenue, approximately $600,000 of commission income, and 40% personal lines business.  (Doc. 77, Ex. 8 at ¶ 80).  Sica explains in his expert report that Farm Bureau's position in rejecting Shifflett was justified and reasonable because the General Partner's valuation was grossly excessive given customary market valuations.  (*Id.* at ¶ 128).  On a revenue multiple basis, the General Partner valued Shifflett at approximately 109-133% higher than comparable transactions, and approximately 43% higher than its publicly traded peers, even though it is only approximately .02% their size.  (*Id*.)  Sica explained that the valuation placed on Shifflett is not market-based and would never be proposed by a credible national buyer experienced in such acquisitions.  (*Id*.)

### iv.    Hegarty-Caplinger Agency

Hegarty-Caplinger was the smallest agency proposed, with $1.9 million in premium revenue and $251,000 in commission income.  (Doc. 77, Ex. 8 at ¶ 100).  Farm Bureau refused to consent to the deal, concluding that the deal was "terrible."  (*Id*.)  Sica classifies Hegarty-Caplinger not as a stand-alone agency business, but as an individual "producer."  (*Id.* at   ¶ 129).  Sica opined that a national buyer would not submit any offer to Hegarty-Caplinger given its size.  (*Id*.)  Specifically, on a revenue multiple basis,

8

Hegarty-Caplinger is valued approximately 48-50% higher than comparable agencies and valued only 18% lower than its publicly traded peers, even though it is only .007% their size.  (*Id.* at ¶ 129).[10]

### v.  Bowen Agency

On January 23, 2010, the General Partner submitted the Acquisition Notice for the Bowen Agency.  (Doc. 81, Ex. 2 at ¶ 33).  Trost consented to the acquisition of the Bowen Agency and signed the Bowen Investment Company Operating Agreement that was to govern the agency after its acquisition.  (*Id.*)  During the period of due diligence undertaken after the Acquisition Notice was consented to by Farm Bureau, the General Partner discovered a lien involving the stock of the agency.  (*Id.*)  The General Partner was able to resolve the lien and allegedly improve the terms of the deal.  (*Id.*)[11]

---

[10] Farm Bureau maintains that the General Partner materially breached the Partnership Agreement and the duty of good faith and fair dealing implied in the Partnership Agreement by refusing to target agencies for acquisition that would enable the Partnership to meet its business objectives.  *Hostetler v. Cent. Farm & Garden, Inc.*, No. 2010 AP 12 0046, 2012 Ohio App. LEXIS 454, at ¶ 51 (Ohio App. Feb. 9, 2012) (once there has been a material breach of their contract, the non-breaching party is not required to fulfill the remaining terms of the contract, and the breaching party is not entitled to collect damages from the non-breaching party). Specifically, Farm Bureau argues that the General Partner submitted agencies with low personal lines business.  For example, the Weber agency was comprised of only 40% personal lines insurance business and 35% life and health insurance, which Farm Bureau could not service. (Doc. 77-1 at ¶ 76).  Similarly, Shifflett had less than 40% of its insurance business in the personal lines segment that Farm Bureau was seeking and 17% was life and health, which Farm Bureau could not convert.  (*Id.* at ¶¶ 80-81).  However, Farm Bureau's "key investment assumptions" were not actual terms of the Partnership Agreement, and therefore the General Partner could not have breached its duty of good faith and fair dealing by failing to pursue agencies that conformed to those criteria.

[11] Farm Bureau's Trost alleged that the new terms improved the deal.  (Doc. 60 at 116-117).

By November 2010, the Bowen Agency acquisition was ready to be funded, and on November 9, 2010, the General Partner submitted a Requested Acquisition Contribution ("RAC") to Farm Bureau.  (Doc. 81, Ex. 2 at ¶ 34).  Plaintiffs maintain that Farm Bureau was contractually obligated to fund the RAC.  (Doc. 58, Ex. 1 at § 6.2(a),(b)).  By memorandum dated November 12, 2010, Farm Bureau denied that it had "approved the acquisition of the Bowen Agency as currently structured" and claimed that a new Acquisition Notice was required so that it could discern whether the Bowen Agency "meets our strategic objectives."  (Doc. 81, Ex. 2).

Plaintiffs maintain that a second Acquisition Notice was not required. Specifically, Plaintiffs cite Section 6.2(b) of the Agreement which states "each Partner shall also deliver within ten (10) days after the receipt of the [RAC] … immediately available funds in the amount set forth in such invoice [the RAC] to an escrow account established for the benefit of the Partnership and Investment Companies."  (Doc. 58, Ex. 1).  Plaintiffs claim that nothing in the Agreement requires the submission of a new Acquisition Notice for an acquisition to which Farm Bureau had already consented.[12]

---

[12]  In fact, Farm Bureau's own expert, Mr. Sica, denied that there were any material changes:

> Q.    My question is, as I read your report here, it appears your evaluation is based upon the deal terms for Bowen as in the acquisition notice, January 2010; correct?
> A.    Yes.
> Q.    Did you receive any documents about the deal terms as changed in October or November '10 for Bowen?
> A.    Yes.
> Q.    Do you know what the deal terms were, how they changed?
> A.    They were not material changes.  It was about a difference of $70,000 of earnings.
> Q.    Okay.    (*See* Doc. 85 at 297-298) (emphasis supplied).

The Court concludes that whether Farm Bureau breached the Partnership Agreement by refusing to consent to the acquisition of multiple Target Companies hinges upon resolution of disputed issues of fact. While there was no criteria in the Partnership Agreement that restrained Farm Bureau from rejecting agencies, given Farm Bureau's course of conduct under Trost, and Mr. Slawin's testimony regarding his own rationale for rejecting agencies, the Court finds that the facts establishing the reasonableness of Farm Bureau's conduct are in dispute.[13]

### b. Acquisition contribution

Next, Plaintiffs contend that Farm Bureau breached the Partnership Agreement when Farm Bureau failed to pay the RAC for certain purchase obligations to the Bowen, Aspen, Garcia, and Campbell Agencies.

Pursuant to Section 6.2(a) of the Partnership Agreement, the General Partner can request a capital contribution from Farm Bureau for the purchase of assets from a Target Company (such request being a "RAC"), but the General Partner must:

> provide the Limited Partner with a notice ("the Acquisition Notice") that provides information regarding the potential Target Company, including, to the extent available, the name of the potential Target company, identity of the principals, location of the business, lines of business and applicable percentages, identity of the insurance carriers they represent and financial statements and such other information as is reasonably

---

[13] *See also* Section 10.7(a) of the Partnership Agreement which empowers the General Partner to enforce the Agreement by suit against Farm Bureau when it fails to fully pay "any Requested Acquisition Contribution" through "legal action to recover such payment…" (Doc. 58, Ex. 1 at § 10.7(a)). Plaintiffs allege that Farm Bureau breached the Agreement in this regard and move the Court to enter judgment against Farm Bureau in the amount of $12,515,580 (99% share of the purchase price for the Four Rejected Agencies, Shoffner, and Bowen).

requested by the Limited Partner to the extent that it is available.

### i. Bowen Agency

On or around January 23, 2010, the General Partner submitted an Acquisition Notice to Farm Bureau for the proposed acquisition of the Bowen Agency. (Doc. 77-1 at ¶ 84). Trost consented to the acquisition of the Bowen Agency and signed the Bowen Investment Company Operating Agreement that was to govern the agency after its acquisition. (Doc. 81-2 at ¶ 33). The General Partner postponed the transaction after liens were discovered. (Doc. 77-1 at ¶ 86). In November 2010, after resolving the liens, the General Partner submitted a RAC for the Bowen Agency acquisition. (*Id.* at ¶ 87). By memorandum dated November 12, 2010, Farm Bureau denied that it had "approved the acquisition of the Bowen Agency as currently structured," and further claimed that a new Acquisition Notice was required so that Farm Bureau could discern whether the Bowen Agency "meets our strategic objectives." (Doc. 81-2, Ex. 2). Farm Bureau requested that the General Partner "conform with the [Partnership] Agreement by sending an acquisition notice with the required information concerning the Bowen Agency." (Doc. 77-1 at ¶ 91). The General Partner never responded. (*Id.* at ¶ 92). Accordingly, Farm Bureau maintains that its obligation to fund the RAC never arose. (*Id.* at ¶ 93).[14]

---

[14] Where a condition precedent has not been met, the contract is not enforceable and an action based upon that agreement cannot be maintained. *See, e.g., Renaissance North, LLC v. Fifth Third Bank*, 512 Fed. Appx. 532, 533 (6th Cir. 2013). Farm Bureau argues that Plaintiffs' failure to submit the second Acquisition Notice constitutes failure to comply with a condition precedent.

Plaintiffs argue that there is no basis to assert that "changes" to the deal terms warranted the submission of a second Acquisition Notice.[15]

Whether Plaintiffs were required to submit a second Acquisition Notice requires resolution of disputed issues of fact.  Accordingly, the Court cannot find, as a matter of law, that Farm Bureau had an obligation to fund the Bowen Agency RAC.

### ii.    Aspen, Garcia, and Campbell Agencies

On March 5, 2013, Farm Bureau sent a memorandum to the Plaintiffs entitled "Termination of Partnership Obligations."  (Doc. 126, Ex. 14).  The memorandum stated that Farm Bureau was "exercising its right to early termination of its obligations under the agreement, which termination shall be effective twelve months from the date of this communication."  (*Id.*)  In light of this letter, the General Partner wrote Farm Bureau on March 18, 2013 and April 16, 2013, seeking clarification and assurances that Farm Bureau would honor its deferred purchase obligations.  (*Id.*, Ex. 15).[16]  These letters were met with silence.

---

[15]  Farm Bureau's expert, Mr. Sica, admitted that there were no material changes in the deal. (Doc. 85 at 297-298).

[16]  The Aspen, Garcia, and Pat Campbell agencies were structured with payments required at the closing of each transaction, plus deferred payments over time.  For example, the Aspen transaction included a contingent payment obligation in relation to producer commissions, which was to be paid over four years in equal quarterly installments at zero percent interest.  (Doc. 60, Ex. 353).  The Garcia acquisition was structured to include a contingent earn-out of 20% of base commission revenues in each year for the five years following closing.  (*Id.*, Ex. 355).  The Campbell acquisition was structured to include a fifteen year note with principal payments to be paid in equal monthly installments of $7,777.00 each, and interest payments to be made quarterly.  The transaction also included a contingent earn-out of $500,000 payable over five years.  (Doc. 60, Ex. 357; Doc. 126, Ex. 1).

In September 2013, the General Partner submitted capital calls for the installment payments due in connection with the acquisition of the Garcia and Campbell Agencies. (Doc. 126, Exs. 2, 3).  Farm Bureau forwarded the funds on September 18 and September 23, 2013, respectively.  (*Id.*, Exs. 4, 5).  In so doing, Farm Bureau noted that "by your capital request…for 99% of the amount due, and your acceptance of these funds, you are acknowledging [Farm Bureau's] continued ownership interest of 99% in the limited partnership and in the LLC's holding the interest in the agencies purchased to date."  (*Id.*, Ex. 4).  In response, the General Partner submitted a letter dated October 3, 2013, alleging that Farm Bureau had forfeited its right in these agencies due to its repeated contractual defaults.  (Doc. 126, Ex. 6).  It also returned the funds.  (*Id.*)  On October 15, 2013, Farm Bureau protested the General Partner's actions and demanded that the General Partner make the necessary payments and confirm the same.  (*Id.*, Ex. 7).

On October 24, 2013, the General Partner submitted RACs with respect to the Campbell, Garcia, and Aspen Agencies, indicating that there had been a default on the Partnership obligations and requesting additional funds.  (Doc. 126, Exs. 8, 9, 10). Specifically, the notices requested payment in full of all deferred payment obligations for all of the Acquired Agencies.  (*Id.*)  On October 28, 2013, Farm Bureau wired the amount of the payments that were timely due only (not non-ripe deferred payments) and demanded that the General Partner make the payments required to Garcia and Campbell. (*Id.*, Ex. 13).  The letter further stated that "[t]he payments [are submitted] with the position that [Farm Bureau] does in fact own 99% of the agencies that [it] is tendering

14

these payments." (*Id.*) The same day, Farm Bureau sent a letter to the General Partner requesting information relating to the purported accelerated payments for deferred payment obligations. (*Id.*, Exs. 12, 13).

On November 4, 2013, the General Partner wrote to Farm Bureau explaining the need for confirmation that the deferred purchase obligations would be honored. The General Partner outlined the risks to the Partners of a refusal to honor the purchase obligations, including the possible impairment of their ownership interests in the agencies. (Doc. 133 at 22). The General Partner also indicated that it had accelerated the payments for all deferred payment obligations in response to Farm Bureau's March 5, 2013 termination notice. (*Id.*, Exs. 14, 15).

Farm Bureau argues that Section 6.2(b) applies only to capital contributions payable at the time of an initial closing, not payment of deferred portions of the purchase price. (Doc. 58, Ex. 1 at § 6.2(b)). Furthermore, because the requested deferred payment obligations were not yet due, Farm Bureau argues that it does not have any obligation to pay the October 24, 2013 RACs.[17] However, the record supports a finding that on sixteen separate occasions after the Four Agencies had been acquired, the General Partner issued RAC's to Farm Bureau to fund obligations associated with those agencies and

---

[17] Farm Bureau also claims that the General Partner's unauthorized attempt to accelerate deferred payment obligations in response to its exercise of a contractual right is a breach of the Partnership Agreement and Plaintiffs' fiduciary obligations.

Farm Bureau paid them.  (Doc. 133-1 at ¶ 3). Therefore, whether Section 6.2(b) applies

only to initial capital contributions requires resolution of disputed issues of fact.[18]

### iii.    Future Annual Contributions

Next, Plaintiffs argue that Farm Bureau breached the Partnership Agreement by

refusing to pay future annual contributions.  (Doc. 58, Ex. 1 at §§ 6.1-6.2).  Farm Bureau

maintains that nothing in the Partnership Agreement supports a finding that it is still

required to pay the annual contributions that Plaintiffs seek.[19]

In the event that the Limited Partner exercised its option to terminate its obligation

to fund Unused Commitment pursuant to Section 6.2(e),[20] the amount of the Annual

Contributions of each Partner shall be based on an amount equal to the Total

Commitment of such Partner, less its Unused Commitment commencing on the early

termination date.  (Doc. 58, Ex. 1, § 6.2(e)).  Farm Bureau maintains that any obligation

that it has to pay future Annual Contributions is based solely on a percentage of the total

---

[18]  Plaintiffs seek declaratory relief from this Court in the form of an order recognizing that
Farm Bureau must do what it represented that it would do – honor its contractual commitment
and fund the deferred purchase obligations.

[19]  The Partnership Agreement requires Farm Bureau to continue to pay its Annual Contributions
until one year after the Partnership is dissolved.  (Doc. 58, Ex. 1 at § 6.2(e)).  The Partnership
Agreement indicates that the earliest possible date of dissolution is February 1, 2020.  (*Id.* at
§ 12.1).  Plaintiffs maintain that Farm Bureau owes $1,695,642 in future Annual Contributions
through February 1, 2021, as calculated based on the RAC's for the Four Approved Agencies.
(Doc. 81 at 29).

[20]  "Unused Commitment" is defined as "the Total Commitment of such Partner, less the
aggregate of all Requested Acquisition Contributions that such Partner has made in accordance
with Section 6.2(a) (other than Refunded Contributions)."  (Doc. 58, Ex. 1 at § 1.1).

RAC payments that it has actually made, and does not include amounts based on RACs that the General Partner feels it "should have" paid. Thus, Farm Bureau argues that Plaintiffs' demand for future Annual Contributions fails as a matter of law.

However, the Court cannot determine whether Farm Bureau is required to pay future Annual Contributions until the disputed issues of fact regarding the Bowen, Aspen, Garcia, and Campbell Agencies are resolved.

### c.  Annual and Expense Contributions

Farm Bureau is obligated to make both its "Annual Contribution" and its "Expense Contribution" to the Partnership to fund expenses. (Doc. 58, Ex. 1 at § 6.1). As defined by the Agreement, the "Annual Contribution" is "an annual fee … in an amount equal to three and one-half percent of such Partner's Total Commitment." (*Id*.) The Annual Contribution is used to cover the salaries of its employees and its fixed cost overhead expenses (office space and furniture). (*Id.*) The "Expense Contribution" is an amount equal to each Partner's *pro rata* share of the Partnership Expenses. (*Id.* at § 3.4). The Expense Contribution of each Partner is used to pay all Partnership Expenses, other than the salaries of employees and its fixed cost overhead expenses (office space and office furniture). (*Id*.)

It is undisputed that the Partners paid Annual Contributions and Expense Contributions one quarter in advance for each quarter from March 2008 through June

2011 (a total of 13 advance payments over three plus years).  (Doc. 81-2 at ¶¶ 43-48).[21]

It is also undisputed that since June 2011, the Annual Contribution and Expense

Contribution have not been paid one quarter in advance.  (*Id*.)  Accordingly, Plaintiffs

move for declaratory judgment that the Partners (including Farm Bureau) are bound by

the Agreement to pay all Annual and Expense Contributions one quarter in advance.

Plaintiffs also move for summary judgment holding Farm Bureau in breach of the

Agreement each time it failed to pay its Annual and Expense Contributions.

### i.    Annual Contributions

Farm Bureau paid each of its Annual Contributions one quarter in advance from

March 2008 through June 2011, an amount equal to $693,000 per year, or $57,750 per

month.  (Doc. 81, Ex. 2 at ¶¶ 45, 64).  Farm Bureau failed to pay a portion of its Annual

Contribution in July 2011 and also failed to pay for the months of August and September

2011, for a total amount of $158,510.  (*Id*.)  Additionally, Farm Bureau has not paid its

Annual Contribution from April 1, 2013 through the present (December 31, 2013), for a

total amount of $693,000.  (*Id*. at ¶ 64).[22]  The Agreement requires the timely payment of

all Annual Contributions.  (*Id*., Ex. 63 at § 6.1).

---

[21] Q. It is your recollection that you had reached an agreement with John Ward that FB Insurance
    Company would advance expenses one quarter in advance?
 A. Yes.
 (Doc. 60 at 249-250).

[22]  The General Partner has paid and continues to pay all Annual Contributions and Expense
Contributions, one quarter in advance.  (*Id*. at ¶ 48).

Plaintiffs move for summary judgment in the amount of $851,510, for payment of all unpaid Annual Contributions due from Farm Bureau through December 31, 2013.

First, with respect to the requested Annual Contribution amount for July, August, and September 2011, Farm Bureau claims such amounts were paid through its $161,000 credit balance. (Doc. 77, Ex. 1 at ¶ 109).[23] A June 1, 2011 capital call memorandum provided a "true up" of Partnership Expenses. Specifically, the General Partner identified the sums to be paid for both: (i) the next quarter's Annual Contribution, as well as (ii) the next quarter's Partnership Expenses. Recognizing that, in the prior quarter, Farm Bureau had advanced expense payments of $160,111 in excess of the expenses actually incurred, the General Partner "trued up" the capital call, thereby reducing the expenses to be contributed by Farm Bureau for the upcoming quarter. However, to the extent that the $160,111 is termed a "credit," Plaintiffs maintain that it was for Partnership Expenses, not the Annual Contribution, which is used to pay the salaries of the employees and fixed

---

[23] The right to offset is a common law right, regardless of whether the Partnership Agreement provides for a right to offset. *Tejada v. Toledo Surgeons, Inc.*, 928 N.E.2d 1138, 1146 (Ohio App. 2009).

cost overhead expenses of the Investment Advisor.[24]  Accordingly, whether the Annual Contribution amount for July, August, and September 2011 were paid through the credit balance requires resolution of disputed issues of fact.

Second, with respect to the Annual Contribution from April 1, 2013 through the present, it is undisputed that Farm Bureau did not pay the contributions.  Instead, beginning in February 2013, Farm Bureau paid the Annual Contribution payments and monthly management fees into an escrow account because of the General Partner's alleged non-performance/breach of contract.  (Doc. 77-1 at ¶ 119).[25]  Again, whether Plaintiffs breached the Agreement first, thereby obviating Farm Bureau's duty to pay its Annual Contributions, requires resolution of disputed issues of fact.

---

[24] Plaintiffs maintain that Tricia Erb's September 8, 2011 email supports a finding that the credit was used to pay expenses incurred by the Partnership in the second and third quarter of 2011. (Doc. 95 at 231-34, Ex. 57).  Writing to Don Hardin in response to his inquiry concerning the so-called "credit," Ms. Erb states "[f]rom the records I have from the Q1 and Q2 capital contribution requests, it looks like that credit you reference was probably eaten up in Q2/Q3 by partnership expenses we haven't seen the detail on yet."  (*Id.*)  Ms. Erb goes on to state "[w]e were using that as a deduction not to pay the management fee [Annual Contribution] but they were using that as a deduction to actual expenses.  So looks like they would say we do not owe management fees [Annual Contribution payments] for July-September as that credit isn't applicable to management fees [Annual Contribution payments] as there are now actual partnership expenses to use that [credit] up."  (*Id.*)

Farm Bureau maintains that this argument is contradicted by a June 1, 2011 memorandum from the General Partner which indicates that there was a credit balance of $160,111 for payments Farm Bureau made in excess of the amounts actually incurred for second quarter expenses.  (Doc. 77-1 at ¶¶ 105-106; Doc. 63, Ex. 411).  Additionally, Don Hardin's September 8, 2011 response to Tricia Erb explains that Farm Bureau used the credit to offset the monthly Annual Contribution required for July, August, and September 2011. (Doc. 130 at 20).

[25] Farm Bureau continues to pay the Annual Contribution payments into escrow, and to date has paid a total of $519,750 into the escrow account.  (Doc. 77-1 at ¶ 119).

### ii.    Partnership expenses

Section 3.4 of the Partnership Agreement governs the payment of partnership expenses incurred by the General Partner.  The language makes it clear that after actual expenses are incurred, they are to be reimbursed within 14 days of the General Partner's transmittal of an "invoice" for such expenses.

> …the Partnership shall bear all costs and expenses attributable to Partnership activities, and shall reimburse the General Partner and the Investment Advisor for all such costs and expenses paid thereby on behalf of the Partnership…
>
> …Any such amounts advanced by the General Partner and not reimbursed by the Partnership within 14 days of invoice shall bear interest…   (Doc. 58, Ex. 1 at § 3.4).

In the spring of 2011, Farm Bureau elected to "audit" the Partnership Expenses. Since the audit, Farm Bureau has refused to pay the bulk of Partnership Expenses. Specifically, it has: (1) ceased paying all of its Expense Contributions one quarter in advance;[26] and (2) refused to pay all Partnership Expenses.  (Doc. 81, Ex. 2 at

---

[26]  Plaintiffs maintain, in part, that Farm Bureau breached the contract by failing to pay expenses one quarter in advance.  Farm Bureau argues that nothing about its prior actions of paying Partnership expenses in advance bind it to continue to advance the expenses.  *Clinch River Capital Partners, Inc. v. Elsea*, Inc., No. 2:11cv400, 2012 U.S. Dist. LEXIS 154205, at *13 (S.D. Ohio Oct. 26, 2012) (the court must apply the plain language of the agreement and may not look outside the four corners of the agreement).  Plaintiffs disagree, claiming that the parties' course of conduct in forwarding expenses each and every quarter is controlling on issues of contractual interpretation.  *St. Marys v. Auglaize County Bd. of Comm'rs*, 875 N.E.2d 561, 568 (Ohio 2007).  The Court finds this argument to be irrelevant given that Farm Bureau has allegedly failed to pay Partnership Expenses since approximately June 2011.  However, the fact that the Partners paid all Annual Contributions and Expense Contributions one quarter in advance for each and every quarter from March 2008 through June 2011 may go to the reasonableness or credibility of Farm Bureau's actions after the change in management.

¶ 63). To date, Plaintiffs maintain that Farm Bureau has refused to pay $1,985,815 in Partnership Expenses, and that they are entitled to summary judgment in this amount for the unpaid expenses due through December 31, 2013. (*Id*.)

On June 1, 2011, the General Partner asked Mr. Slawin to pay in advance for estimated future expenses that had not yet been incurred. (Doc. 77-1 at ¶ 105). Farm Bureau advised the General Partner in writing on June 2, 2011 that it would reimburse actual and reasonable expenses incurred by the General Partner and "attributable to Partnership activities" as provided in Section 3.4 of the Partnership Agreement. (*Id.* at ¶ 107). Specifically, Farm Bureau advised the General Partner that it would not advance estimated expenses and only intended to reimburse valid partnership expenses that had been incurred, substantiated, and invoiced. (*Id.* at ¶ 108).

Farm Bureau argues that Plaintiffs have failed to offer any evidence that the expenses it declined to pay were expenses "attributable to Partnership activities."[27] Farm Bureau maintains that the vast majority of claimed Partnership expenses that it declined to pay are the General Partner's legal fees in this litigation, and that such fees are not reimbursable because the Partnership is not in the business of initiating litigation against the 99% Limited Partner.

However, Section 3.4 subsection (v) of the Agreement states that Partnership Expenses include "extraordinary expenses of the Partnership…including without

---

[27] Section 3.4 of the Partnership Agreement provides that "the Partnership shall bear all costs and expenses attributable to Partnership activities." (Doc. 58, Ex. 1).

22

limitation legal fees and litigation expenses." (Doc. 58, Ex. 1 at § 3.4(v)). Moreover, Section 10.7(a) of the Partnership Agreement authorizes the General Partner to "pursue and enforce all rights and remedies that the Partnership may have against [a] Defaulting Partner…including, without limitation, commencement of a legal action" to cure that Partner's default. Section 10.7(a) further provides that "[t]he costs of enforcing the Partnership's rights and remedies shall be borne by the Defaulting Partner." These contractual provisions establish that legal fees may constitute Partnership Expenses for which Farm Bureau must pay its pro rata share. However, whether Farm Bureau is a Defaulting Partner requires resolution of disputed issues of fact, and, therefore, the Court cannot determine whether Farm Bureau was obligated to pay such expenses.[28] There are also disputed issues of fact as to whether Farm Bureau righteously suspended its payment of Partnership Expenses because it discovered malfeasance on the part of the General Partner, or whether it was simply part of its exit strategy.

---

[28] Additionally, Plaintiffs argue that there are outstanding expenses that are not simply "legal invoices" including travel expenses, hotel rates, telephone calls, parking charges, and office supplies. The Court notes that the parties' Agreement speaks of "legal fees and litigation expenses."

### 2. *Indemnity and Declaratory Judgment*

Plaintiffs' claims for indemnity[29] and declaratory judgment[30] are dependent upon and derivative of their claim for breach of contract.

As the Court has previously determined in Section III.A.1, *supra*, there are questions of fact as to whether the Partnership Agreement was breached. Accordingly, the Court cannot make findings, as a matter of law, regarding the indemnity and declaratory judgment claims.

### 3. *Breach of Fiduciary Duty*

Next, Plaintiffs allege that as a Limited Partner, Farm Bureau breached its fiduciary duty.[31] Farm Bureau maintains that under Ohio law, it does not owe fiduciary duties to the General Partner.[32]

---

[29] In conjunction with the Partnership Agreement, Farm Bureau executed a Subscription Agreement relating to the Partnership. (Doc. 16 at ¶ 55). In the Subscription Agreement, Farm Bureau agreed to indemnify the Partnership, General Partner, and Investment Advisor from any and all damage, loss, cost, and expense (including attorneys' fees) that may be incurred (i) by reason of Farm Bureau's failure to fulfill any terms of the Subscription Agreement; or (ii) by reason of any misrepresentation or the breach of any warranty made by Farm Bureau in the Subscription Agreement. (*Id.* at ¶ 56). Plaintiffs claim that Farm Bureau breached the obligations, representations, and warranties in the Subscription Agreement, and as a result suffered damage, loss, cost, and expense. Plaintiffs seek summary judgment on the claim that Farm Bureau must indemnify them for those losses.

[30] Pursuant to 28 U.S.C. Section 2201, this Court is expressly empowered to "declare the rights and other legal relations of any interested party" under the terms of a contract. Section 10.7 of the Partnership Agreement identifies the consequences that will result when the Limited Partner has breached its terms. Section 10.7(a)(vi) states that the General Partner may "have half of the Defaulting Partner's (A) interests forfeited to the Partnership and (B) interests in any Investment Company absolutely forfeited." (Doc. 58, Ex. 1). Accordingly, Plaintiffs maintain that they are entitled to an Order declaring Farm Bureau as the defaulting partner and providing Plaintiffs with everything that comes with such a default under Section 10.7 of the Partnership Agreement.

Plaintiffs concede that limited partners do not *ordinarily* owe fiduciary duties to the general partner or the partnership, but contend that Farm Bureau's exercise of its contractual rights to withhold consent to proposed acquisitions gave rise to a *de facto* fiduciary duty.  Where a limited partner acts as more than a mere "passive investor," and takes an active role in the partnership's business activities and/or management, the limited partners activities may give rise to fiduciary duties.  *Leigh v. Crescent Square, Ltd.*, 608 N.E.2d 1166, 1171 (Ohio App. 1992) (an issue of fact precluding summary judgment existed as to whether the limited partner's role as a "syndicator" responsible for soliciting investors and facilitating communications between partners gave rise to fiduciary duties).  A *de facto* fiduciary relationship may be recognized where both parties understand that under the circumstances, a special trust and confidence has been reposed in one by the other.  *Casey v. Reidy*, 906 N.E.2d 1139, 1144-1145 (Ohio App. 2009). Ohio courts have required complete dependence by the inferior party in order to recognize the *de facto* status.  (*Id.*)

---

[31]  The Supreme Court of Ohio has defined a "fiduciary relationship" as one "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of special trust."  *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 662 N.E.2d 1074, 1081 (Ohio 1996).  The elements for a breach of fiduciary duty claim are: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom."  *Thomas v. Fletcher*, No. 17-05-31, 2006 Ohio App. LEXIS 6590, at *2 (Ohio App. Dec. 18, 2006).

[32]  In a limited partnership, the general partner owes a fiduciary duty to the limited partners, but there is no Ohio law that a limited partner owes fiduciary duties to a general partner and the limited partnership.  *Arpadi v. First MSP Corp.*, 628 N.E.2d 1335 (Ohio 1994).  In fact, Ohio case law acknowledges that limited partners do not owe fiduciary duties.  *Leigh v. Crescent Square, Ltd.*, 608 N.E.2d 1166 (Ohio App. 1992) (noting that no fiduciary duty exists from limited to general partners).

25

Farm Bureau argues that the Partnership Agreement does not evidence complete dependence from Plaintiffs and that the General Partner has the most power and discretion under the Partnership Agreement.  Specifically, even if the Partnership Agreement allocated limited authority and power to Farm Bureau through its contractual veto provision, this power exists only as a matter of contract and the Partnership Agreement does not expressly impose any fiduciary duty on Farm Bureau.  Therefore, Farm Bureau argues that the proper limit on its veto power is the obligation of good faith and fair dealing, not fiduciary duty.[33]

The fact that Farm Bureau must provide its consent before a Target Company may be acquired places Farm Bureau at the very heart of the Partnership's business operations. Given the integral nature of Farm Bureau's "consent" role, it is reasonable that such power be exercised responsibly, in good faith, and for the benefit of both Partners.[34] Here, Plaintiffs maintain that Farm Bureau used the "veto" power to frustrate the entire purpose of the Partnership.

---

[33] Unif. Ltd. Part. Act. 305 (2001) Comment (where partnership agreement allocates authority and power to limited partner, the power exists only as a matter of contract, and the proper limit on such contract-based power is the obligation of good faith and fair dealing, not fiduciary duty).

[34] Delaware courts have long recognized that a limited partner may be subject to fiduciary duties where it has exercised "management or control" over the partnership.  *See, e.g., Feely v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del Ch. 2012) (recognizing that "[p]assive limited partners do not owe default duties, but under certain circumstances, they can assume fiduciary duties if they take on an active role in the management of the entity).

Considering the totality of the facts and circumstances of this case, the Court finds that whether Farm Bureau's veto power gives rise to a fiduciary duty requires resolution of disputed issues of fact.

### 4. Damages

Plaintiffs seek significant monetary damages in this case, and Farm Bureau argues that the Court should deny these damages as a matter of law. Specifically, Farm Bureau argues that Plaintiffs seek damages that exceed their actual loss in contravention of well-established Ohio law.

### a. Expert testimony

First, Farm Bureau claims that Plaintiffs' damage allegations fail because they do not have a damages expert and there "will be no qualified, knowledgeable damages testimony from an accountant or economist that will satisfy customary standards of reliability, objectivity and sound, peer-reviewed methodology." (Doc. 112 at 2). Specifically, Farm Bureau opines that Plaintiffs will ask Mr. Ward to testify about double and triple recoveries. To the extent that Farm Bureau moves to exclude Mr. Ward from testifying about damages, it should file a motion to exclude and/or a motion *in limine*.

### b. Funding contributions

Farm Bureau refused to consent to (or fund) the acquisition of six Target Companies, including the Four Rejected Agencies, as well as the Shoffner Agency and the Bowen Agency. But for Farm Bureau's alleged wrongful conduct, Plaintiffs claim that Farm Bureau would have paid its 99% share of the purchase price for those six

27

agencies, for a total of $12,515,580.  (Doc. 81-2 at ¶ 53).  However, Farm Bureau argues that it cannot be required to pay contributions equivalent to the purchase price of the Agencies.

Section 10.7(a) of the Partnership Agreement provides the General Partner with several options, including the authority to "pursue and enforce all rights and remedies that the Partnership may have against such Defaulting Partner … including, without limitation, the commencement of a legal action to recover such payment from the Defaulting Partner."  (Doc. 58, Ex. 1 at § 10.7(a)).  Additionally, Ohio law provides a separate, distinct basis of authority requiring Farm Bureau to pay into the Partnership any contributions it has wrongfully refused to make.  Specifically, Ohio Revised Code Section 1782.28(B) provides that "a partner is obligated to the limited partnership to perform any enforceable promise to contribute cash or other property…even if he is unable to perform because of death, disability or any other reason…If a partner fails to make a required contribution of property or services, he shall be obligated, at the option of the limited partnership, to contribute cash equal to the portion of the value … of the stated contribution that he has failed to make."

The Court finds that to the extent Plaintiffs prove that Farm Bureau wrongfully refused to consent to (or fund) the acquisition of a given Target Company, the General Partner, for the benefit of the Partnership, is authorized to institute legal proceedings to recover those contributions.

### c. Forfeiture Provisions

Finally, Farm Bureau argues that the forfeiture provisions in the Agreement[35] are "draconian" and thus unenforceable because they constitute a penalty. Farm Bureau maintains that whether Sections 10.7 and 8.7 provide for liquidated damages or an unenforceable penalty presents a question of law that this Court can resolve at this juncture. *Kehoe Component Sales, Inc. v. Best Lighting Prods.*, 933 F. Supp. 2d 974, 997-998 (S.D. Ohio 2013).

Both Section 10.7 of the Partnership Agreement and Section 8.7 of the Investment Company Operating Agreement provide that a Defaulting Partner (one who fails to make requisite contributions or otherwise breaches the Partnership Agreement) may be required to forfeit one half of its interests in the Partnership and/or a given investment company. "[T]he remedies available to the partnership when a limited partner does not meet his or her obligations are frequently negotiated between the partnership and its partners" and may expressly include the "diminution of the partner's interest in the partnership" as well as other remedies such as the right to foreclose upon and sell the defaulting limited partner's entire ownership interest. J. William Callison and Maureen A. Sullivan, Partnership Law and Practice, General and Limited Partnerships, § 24:3. These provisions represent the negotiated understanding between Partners that a Limited Partner's improper refusal to make required contributions may cause the Partnership to

---

[35] Farm Bureau refers specifically to Section 10.7 of the Partnership Agreement and Section 8.7 of the Investment Company Operating Agreement.

default on financial obligations or contractual commitments owed to others, and thus expose the Partnership to severe economic harm and/or significant reputational damage. *Id.*[36]

Plaintiffs argue that Farm Bureau attempts to shoehorn Sections 10.7 and 8.7 into a liquidated damages analysis. "Liquidated damages are, by definition, a 'pre-breach' contractual estimation of the actual damages that would probably ensue from a breach of the contract. The parties agree that in the event of a breach, the liquidated damages will be paid." *Domestic Linen Supply & Laundry Co. v. Kenwood Dealer Group, Inc.*, 672 N.E.2d 184, 190 (Ohio App. 1996). However, neither agreement stipulates a sum certain that the breaching party must pay as a consequence of its contractual breach.[37] If the Court strikes sections 10.7 and 8.7, there will be no practical consequence for Farm Bureau's alleged contractual breaches.

Since a jury must decide whether Farm Bureau wrongfully rejected the acquisition of Target Companies, the Court cannot presently, as a matter of law, determine that Section 10.7 constitutes a penalty. For example, if the jury found Farm Bureau liable for the rejection of only one Target Company acquisition, Section 10.7 would not constitute

---

[36] For example, Farm Bureau's rejection of the Shofner Agency exposed the Partnership to threats of litigation. Both the owner of the Shofner Agency and the Pat Campbell Agency, who facilitated the Shofner transaction, wrote the General Partner indicating their dismay at the rejection and alleging that it has caused tangible harm. (Doc. 81-2 at ¶ 5).

[37] Farm Bureau fails to cite any case that evaluates a forfeiture provision through the lens of "liquidated damages," much less any cases invalidating such a forfeiture provision on the theory that it constitutes an improper "penalty" of some sort.

a draconian penalty because Farm Bureau would retain half of its ownership interest in the Partnership (as well as the pertinent Investment Company).

Moreover, Section 10.7 meets all three prongs of the analysis set forth in *Samson Sales, Inc. v. Honeywell, Inc.*, 465 N.E.2d 392, 392 (Ohio 1984).  Whether a particular sum specified in a contract is intended as a penalty or as liquidated damages depends on the operative facts and circumstances surrounding each particular case.  *Id.*  Where the parties have agreed on the amount of damages and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be: (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.  *Id.*

First, the damages Plaintiffs will sustain upon Farm Bureau's rejection of a given Target Company are uncertain and difficult to prove.  For example, it cannot be determined whether, had an Agency been acquired, Farm Bureau would have exercised its option at all, much less what percentage of premium would have converted.

Second, even assuming that Farm Bureau would have decided not to exercise its option, it is impossible to discern the terms of a hypothetical future sale that will not take place.  Therefore, it is impossible to calculate the precise dollar figure by which the

31

General Partner has been damaged in light of Farm Bureau's refusal to acquire a given Target Company.

Third, neither party has ever asserted that the Partnership Agreement does not accurately reflect the parties' intent. Considering the Agreement from the vantage point of the parties upon entering the contract, both would want a mechanism that would ensure that the acquisition contributions would be honored.[38] With that money, the General Partner could make a reasonable effort to revive and fund the acquisition that had been rejected or, were that opportunity no longer available, pursue additional acquisitions, holding the acquisition contributions secured through Section 10.7(a) as a possible funding source. Therefore, the Court declines to find that Sections 10.7 and 8.7 constitute improper penalties.

Accordingly, the Court declines to find, as a matter of law, that Plaintiffs seek damages that exceed their actual loss in contravention of Ohio law.

### B. Defendants' Counterclaims

#### 1. Accounting Claim

First, Farm Bureau asserts that the General Partner refused to provide "sufficient information" to allow it to determine that "the Partnership's reimbursement of the General Partner for submitted expenses were for expenses actually related to Partnership

---

[38] "[C]ourts are required to interpret the contract in such a way as to give effect to the intention of the parties at the time the agreement was entered into, as evidenced by the provisions of the contract." *Watkins v. Brown*, 646 N.E.2d 485, 487 (Ohio App. 1994).

business." (Doc. 9 at ¶¶ 52-56). Accordingly, Farm Bureau requests that the Court order a strict accounting of the partnership expenses and fees. (*Id.* at ¶ 57).

Farm Bureau claims that its audit report and testimony reveals that it has not been provided with adequate documentation of a substantial portion of Partnership expenses. (Doc. 112, Ex. 1 at ¶ 147). For example, travel expenses that were submitted as Partnership expenses did not include the requisite invoices and receipts for analysis of whether the expenses were in furtherance of partnership activities. (*Id.*) Additionally, the ledgers provided by the General Partner are incomplete and do not include descriptions regarding the nature of the payment or the purpose of the expenditure. (*Id.*) Conversely, Plaintiffs maintain they have provided Farm Bureau with all Partnership-related documents, including those that document Partnership expenses, excluding those governed by the attorney-client privilege. (Doc. 81-2 at ¶ 72).

In this context, the Court finds that there are genuine issues of material fact as to whether the General Partner failed to provide the requisite information and/or whether the information provided is sufficient to account for partnership expenses.

Accordingly, summary judgment is improper on Farm Bureau's accounting claim.

### 2. *Breach of Contract*

Next, Farm Bureau asserts that the General Partner breached the Partnership Agreement is a variety of different ways.

### i.      Due diligence

First, Farm Bureau claims that the General Partner precluded it from performing "due diligence" of the acquired Target Companies.  (Doc. 112, Ex. 1 at ¶ 145; Doc. 77, Ex. 1 at ¶ 110).  Farm Bureau alleges that it asked to perform due diligence on the agencies multiple times and even spent weeks negotiating confidentiality agreements so that it could perform due diligence.  (Doc. 112, Ex. 1 at ¶ 145).

Plaintiffs argue that Farm Bureau knew that "by extending the deal terms [for the Four Acquired Agencies], its purchase option-the mechanism which triggers any possible conversion of premium-was to be deferred.  [And it was] unable to convert an agency in the amount of time that was presumed when we started the Partnership."  (Doc. 63 at 198).  Plaintiffs maintain that Farm Bureau's new management, frustrated by this reality, simply chose to ignore it and demanded to exercise its option on the Aspen agency well before the deferred conversion period had even run.[39]  Accordingly, Farm Bureau's "due diligence rights" were allegedly impaired before it had a right to exercise its purchase option in the first place.

However, Section 8.9(g) of the Operating Agreement states that Farm Bureau "may, upon execution of a confidentiality agreement … commence a due diligence review of the business of the Target Company in connection with its decision to exercise the Option."  (Doc. 56, Ex. 2 at § 8.9).  This provision clearly grants Farm Bureau the

---

[39]  Plaintiffs maintain that they attempted to work with Farm Bureau to facilitate its review and analysis of all relevant agency documents, but it was Farm Bureau that abandoned the dialogue and its due diligence of the Aspen Agency.

right to perform due diligence in order to make a decision regarding whether to exercise its option.  Whether Farm Bureau sought to exercise its contractual due diligence rights requires resolution of disputed issues of fact.

### ii.        Consulting Agreement with B&R

Second, Farm Bureau asserts that the General Partner entered into "consulting arrangements" that were not on an "arms-length basis" and were thus improper.  (Doc. 58, Ex. 1 at § 3.5).  B&R was retained by the Partnership (through the General Partner) to assist in the identification of potential Target Companies and monitoring of acquired Target Companies.  Farm Bureau's Mr. Trost testified that he knew B&R would be paid as a consultant from the Partnership's expense budget.  (Doc. 60 at 201, 204, 209).

However, genuine issues of material fact remain regarding whether Farm Bureau knew B&R also had an ownership interest in the General Partner, or what role B&R would undertake in relation to the Partnership.  In fact, Trost testified that he did not recall the General Partner ever disclosing that B&R had an ownership interest in the General Partner.  (Doc. 112, Ex. 1 at ¶ 49).[40]

Accordingly, whether Plaintiffs violated the Partnership Agreement by entering into an improper consulting arrangement with B&R requires resolution of disputed issues of fact.

---

[40]  Trost further testified that he had no idea what B&R Consulting did in relation to the Partnership on a day-to-day basis.  (*Id.*)

### iii.    Maintain Books

Third, Farm Bureau asserts that the General Partner breached the Partnership

Agreement by failing to properly maintain the books and records.  (Doc. 9 at ¶ 31;

Doc. 81-2 at § 7.1).  Specifically, Farm Bureau maintains that the General Partner failed

to produce audited financial statements for the four Acquired Agencies from 2011

through 2013.  (Doc. 126, Exs. 18, 19, 20).  Additionally, the General Partner did not

audit 2010 financial statements for the Acquired Agencies until December 2013.  As a

result, Farm Bureau had to delete the Acquired Agencies from its balance sheet, thus

reducing Farm Bureau's surplus (the insurance equivalent of net worth) by almost $5

million.  (*Id.*)  Farm Bureau maintains that it has yet to receive outstanding information

regarding the 2010 audit reports.

Plaintiffs maintain that there is no support for the assertion that there are

deficiencies in the 2010 independent audit reports.  Plaintiffs claim there is no evidence

as to what standards the independent audits were allegedly required to meet, much less

how the 2010 independent audit allegedly fell short.  Additionally, Plaintiffs argue that

Farm Bureau has not deleted the Acquired Agencies from its balance sheet as it claims.[41]

---

[41]  Jan Sewright, a Farm Bureau witness, testified that Farm Bureau elected not to "admit" the
Four Agencies in its statutory financial statements while independent audits were pending.  (Doc.
83 at 37-40).  When asked what would happen once Farm Bureau received the audit materials,
Sewright stated "[f]or future financial statements, we could admit those assets."  (*Id.* at 37-40).
When asked how the non-admittance of the agencies (as assets) impacted Farm Bureau, she
responded: "[t]here's not a specific financial cost."  (*Id.* at 39-40).  When asked if the non-
admittance of the assets was a concern for Farm Bureau, she said it was not.  (*Id.*)

Accordingly, whether the General Partner failed to properly maintain the books and records requires resolution of disputed issues of fact.

### iv.    Transaction Fees

Fourth, Farm Bureau claims that the General Partner breached the Partnership Agreement by "diverting" or "misappropriating" Partnership funds.  This claim focuses on two subjects: (i) the retention of B&R (and the payment of funds to that entity), and (ii) the payment of transaction fees by the Partnership upon closing of each of the four acquired Target Companies.

The Management Services Agreement states that the Investment Advisor (which is wholly owned by John Ward)[42] "shall engage and maintain personnel for the purpose of identifying and structuring transactions of a type contemplated by the Partnership Agreement," and "shall perform and render management, investment, administrative, consulting and other services" to the Partnership.  The Agreement also states that the Partnership will pay management fees to the Investment Advisor in an amount equal to the Annual Contributions of the Partners.  (Doc. 58, Ex. 1 at § 6).  These provisions expressly preclude the General Partner from obtaining reimbursement for services it is

---

In fact, at the end of 2011, before the purportedly "critical" 2010 independent audit was completed, Farm Bureau "admitted" the Four Acquired Agencies on its books.  (*Id.* at 37-40). Accordingly, Plaintiffs maintain that the process of "admitting" or "non-admitting" assets is misleading.

[42]  John Ward is a member of Plaintiff Cincinnatus Capital Partners, I, LLC and has primary responsibility for the General Partner.  (Doc. 81-2 at ¶¶ 2, 7).

required to perform under the Management Services Agreement and for which it is already being paid significant management fees.

However, in 2009, the General Partner sought and received reimbursement for $200,000 in transaction fees charged by the Investment Advisor in relation to the four Acquired Agencies.  (Doc. 112, Ex. 1 at ¶ 64).  The amounts of the transaction fees were listed at the end of each Acquisition Notice, and each fee was listed in small print under the headings "Calculation of Transaction Costs."  (*Id*.)  The only description of the transaction fee was a notation for a certain amount ranging from $25,000-$75,000 next to "Cincinnatus Partners," along with other varying amounts listed for accounting, legal, background checks, B&R, and other.  (*Id*.)  The Acquisition Notices contained no description of how these amounts were calculated, what services they related to, or why these services were not already provided for in the Annual Contribution or the Expense Contribution.  Accordingly, Farm Bureau maintains that the transaction fees charged by the General Partner were a breach of the Partnership Agreement.

Conversely, Plaintiffs maintain that the Partners specifically discussed the transaction fees before any Target Companies were acquired.  (Doc. 81-2 at ¶¶ 31-32).  With regard to the amount of the transaction fee, the General Partner noted that the sum was to be determined by Farm Bureau and that such fee should be fair and reasonable to Farm Bureau.  (*Id*.)  Trost testified that, as to each of the four acquired Target Companies, he had been advised in advance of the transaction fee (including its amount) and had consented to the payment of the transaction fee.  (Doc. 60 at 172-183).

Accordingly, whether the transaction fees were proper requires resolution of disputed issues of fact. Therefore, summary judgment is denied as to Farm Bureau's breach of contract claims.

### 3. Breach of Fiduciary Duty

Farm Bureau maintains that the General Partner breached both the express terms of the Partnership Agreement and the General Partner's implied duty of good faith, by targeting agencies for acquisition that could not possibly have any economic benefit. Specifically, Farm Bureau argues that as the Limited Partner, the General Partner owes it a fiduciary duty. Farm Bureau alleges that the General Partner breached its fiduciary duty by: (1) refusing to perform its obligation to identify Target Companies that meet the agreed-upon criteria of the Partnership Agreement and the assumptions underlying the Partnership Agreement; (2) mismanaging the Partnership's funds and Farm Bureau's 99% capital contribution, as evidenced by the General Partner's failure to maintain proper books and records; (3) performing its obligations in bad faith; (4) seeking and recovering reimbursement for expenses already covered by Farm Bureau's annual contribution; (5) improperly retaining entities controlled by members of the General Partner to provide services to the Partnership; and (6) diverting and misappropriating Partnership funds.

As this Court has already discussed *infra*, each of these allegations present disputed issues of fact. Accordingly, the Court declines to grant summary judgment on Farm Bureau's breach of fiduciary duty claim.

## IV.  CONCLUSION

Accordingly, for these reasons, the parties' motions for summary judgment

(Docs. 77, 81) are **DENIED**.

**IT IS SO ORDERED**.

Date:  4/9/14                                         <u>*s/ Timothy S. Black*</u>
                                                  Timothy S. Black
                                                  United States District Judge